IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Edward W. Nottingham**

Civil Action No. 06–cv–02023–EWN–CBS

HIGHLINE CAPITAL CORP., a Delaware corporation,

      Plaintiff,

v.

ROBEN D. AHDOOT, d/b/a INGLEWOOD OPEN MRI,

      Defendant/Third-Party Plaintiff,

v.

MOOSA HEIKALI, and
UNITED LEASING & DISTRIBUTIONS, INC.,

      Third-Party Defendants.

and

---

Civil Action No. 06–cv–02024–EWN–BNB

HIGHLINE CAPITAL CORP., a Delaware corporation,

      Plaintiff,

v.

SEPEHR KATIRAIE, M.D., INC., d/b/a LYNWOOD MEDICAL
IMAGING, a California corporation,
SEPEHR KATIRAIE, and MOOSA HEIKALI

      Defendants/Third-Party Plaintiffs,

v.

UNITED LEASING & DISTRIBUTIONS, INC.,

Third-Party Defendant.

---

## ORDER AND MEMORANDUM OF DECISION

---

This is a consolidated contracts case. As relevant to the instant motion, Plaintiff Highline Capital Corp. alleges breaches of: (1) a lease/purchase agreement between itself and Defendant Sepehr Katiraie, M.D., Inc. (hereinafter "SKMD"); and (2) a personal guarantee of this agreement executed by Defendant Sepehr Katiraie. This matter comes before the court on "Plaintiff's Motion for Summary Judgment Against Sepehr Katiraie, M.D., Inc. [sic] and Sepehr Katiraie," filed June 11, 2007. Jurisdiction is proper pursuant to 28 U.S.C. § 1332(a)(1).

## FACTS

### 1.     *Factual Background*

This case has a convoluted procedural posture which I have laid out in detail in my Order and Memorandum of Decision granting Third-Party Defendant United Leasing and Distribution, Inc.'s (hereinafter "United Leasing") motion to dismiss third-party complaints against it, filed February 20, 2008. (*See* Order and Mem. of Decision [filed Feb. 20, 2008].) Familiarity therewith is assumed. In as briefly a manner as possible, I lay out the facts relevant to the instant motion.

This breach of contract action arises from a document styled a "Master Lease Agreement" (hereinafter the "lease/purchase agreement") executed between Plaintiff and SKMD, and a personal guarantee of this agreement executed by Dr. Katiraie. (*See* Pl.'s Opening Br. in Supp. of

Its Mot. for Summ. J. Against Sepehr Katiraie, M.D., Inc. [sic] and Sepehr Katiraie [hereinafter "Pl.'s Br."], Ex. 3 at 2, 7 [Lease/Purchase and Personal Guarantee Agreements] [filed June 11, 2007].) These documents are dated May 1, 2005, and May 2, 2005, respectively. (*See id.*) The agreements were brokered by a third party, United Leasing, whose actions in brokering them lie at the heart of the instant summary judgment motion. (*See, e.g.*, Defs.' Resp. in Opp'n to Pl.'s Mot. for Summ. J. [hereinafter "Defs.' Resp."], Material Facts [hereinafter "SAF"] ¶¶ B1–B13 [filed June 21, 2007].)[1] I first describe the parties to this action and the events leading up to the execution of these agreements, and then discuss the terms of these agreements and the facts relevant to Defendants' affirmative defense on Plaintiff's breach of contract claims.

### a.   The Parties

Dr. Katiraie is a medical doctor licensed to practice in the state of California, and is the sole officer and owner of SKMD. (Pl.'s Br., Statement of Undisputed Material Facts [hereinafter "SOF"] ¶¶ 1–2.)[2] Sometime in early 2005, Dr. Katiraie and Mossa Heikali became partners in the

---

[1] In brazen contravention of this court's practice standards, Defendants fail to answer Plaintiff's statement of undisputed material facts, or to offer their own statement of additional disputed facts. (*See* Defs.' Resp. at 2–12; *see also* Practice Standards — Civil: Special Instructions Concerning Motions for Summary Judgment ¶¶ 4–5.) Instead, Defendants offer a single section of proffered facts, confusingly organized by both letter and number. (*See* Defs.' Resp. at 2–12.) While the court might usually strike Defendants' response for such non-compliance with its practice standards, it nonetheless chooses to consider Defendants' brief because — through sheer dumb luck — such non-compliance with the practice standards does not preclude critical determinations of either fact or law. Nonetheless, the court admonishes Defendants for their laxity.

[2] Many of the basic facts of this case were neither admitted nor denied by Defendants. Rather than deem them admitted, I merely recite Plaintiff's presentation of these facts as their truth or falsity is irrelevant to resolution of the instant motion.

practice of medicine and decided to purchase an MRI machine and CT scanner (hereinafter the "Equipment"). (*Id.*, SOF ¶¶ 3–4.) To facilitate in this transaction, Dr. Heikali introduced Dr. Katiraie to United Leasing. (*Id.*, SOF ¶ 8.) United Leasing is a supplier of medical equipment to companies such as Plaintiff, which, in turn, is in the business of leasing/selling such equipment to clients such as Dr. Katiraie. (*See* Pl.'s Reply Br. in Supp. of Its Mot. for Summ. J. Against Sepehr Katiraie, M.D., Inc. [sic] and Sepehr Katiraie at 13–15 [hereinafter "Pl.'s Reply"], Response Concerning Alleged Disputed "Material Facts" [hereinafter "RSAF"] ¶ B1 [filed July 6, 2007].)

   **b.     *April 2005 Negotiations Between Dr. Katiraie and United Leasing***

   Although Defendants inexplicably fail to cite to any direct deposition testimony so demonstrating, their proffered evidence nonetheless suggests that Dr. Katiraie and United Leasing began discussing a possible lease/sale of the Equipment to SKMD in early April 2005. Specifically, Defendants proffer a "Business Application" on United Leasing letterhead which contains Dr. Katiraie's bank account information and which is dated April 4, 2005. (*See* Defs.' Resp., Ex. C [Business App.].) Plaintiff's Senior Account Executive acknowledged in a deposition that Plaintiff received this application from United Leasing as part of its initial credit review of Dr. Katiraie. (*See id.*, SAF ¶¶ C3, C5; *admitted at* Pl.'s Reply, RSAF ¶¶ C3, C5; *see also id.*, Ex. C [Business App.].) In addition, email communications between United Leasing and Plaintiff suggest that discussions between Dr. Katiraie and United Leasing regarding a possible lease/sale had occurred by late April 2005. Specifically, one of Plaintiff's Portfolio Administrators emailed the president of United Leasing on April 22, 2005, instructing him to have Dr. Katiraie

sign attached documents and return them to Plaintiff "along with a check for the first and last months' rent in the amount of $13,578.08." (*Id.*, Ex. H at 2 [4/22/05 Email].)[3] Defendants also proffer a copy of an April 23, 2005, check from Dr. Katiraie to United Leasing in amount of $13,578.08. (*Id.*, Ex. D [4/23/05 Check].)

c.    *May 2005 Execution of the Agreements Through Intermediation of United Leasing*

Following these April 2005 negotiations, Defendants executed the lease/purchase and personal guarantee agreements (hereinafter the "Agreements") with Plaintiff on May 1, 2005, and 2, 2005, respectively. (*See* Pl.'s Br., Ex. 3 at 2, 7 [Lease/Purchase and Personal Guarantee Agreements].) Again, although Defendants fail to cite any direct deposition testimony so demonstrating, the evidence before this court suggests that the Agreements were executed remotely through the intermediation of United Leasing. Specifically, Plaintiff's Senior Account Executive confirmed that, rather than correspond directly with Dr. Katiraie, Plaintiff sent the lease documents directly to United Leasing. (*See* Defs.' Resp., SAF ¶¶ C4, C5; *admitted in relevant part at* Pl.'s Reply, RSAF ¶¶ C4, C5.) Moreover, Dr. Katiraie testified that United Leasing's president did not allow him time to review the documents prior to signing, thus suggesting that United Leasing intermediated the execution of the documents. (*See id.*, Ex. B at 4 [Katiraie Dep.].) Finally, the signatures of Plaintiff's and SKMD's agents bear different dates, thus reinforcing this court's perception that United Leasing intermediated the execution of the

---

[3]Defendants, for no apparent reason, submit no fewer than five identical copies of this email. (*See* Defs.' Resp., Ex. H [4/22/05 Email].) The court notes that a single copy with sufficient explanation would have been far more effective than the blunt force of all five.

Agreements between Plaintiff and Defendants.  (*See* Pl.'s Br., Ex. 3 at 2 [Lease/Purchase and Personal Guarantee Agreements].)

### d.      Terms of the Agreements

The lease/purchase agreement requires SKMD to make seventy-two lease payments of $6,271.63 each to Plaintiff for the Equipment.[4]  (*See id.*, Ex. 3 at 4 [Lease/Purchase Agreement].) The agreement recites that it cannot be cancelled during the term, and provides a one-dollar buyout option at the end of this term.  (*See id.*)  The agreement also states: "YOU AGREE THAT NEITHER SUPPLIER NOR ANY SALESPERSON, EMPLOYEE OR AGENT OF SUPPLIER IS OUR AGENT OR HAS ANY AUTHORITY TO SPEAK FOR US OR TO BIND US IN ANY WAY."  (*Id.*, Ex. 3 at 3 [Lease/Purchase Agreement] [emphasis in original].) Finally, the agreement contains a merger clause stating: "You agree that the terms and conditions contained in this Lease and any Schedule attached to this Lease make up the entire agreement between you and us regarding the lease of the Equipment."  (*Id.*)

The personal guarantee by Dr. Katiraie purports to be "in consideration of [Plaintiff's] entering into [sic] Master Lease dated April 22, 2005, [sic] with [SKMD]," and requires Dr. Katiraie to personally perform under lease/purchase agreement if SKMD defaults.  (*Id.*, Ex. 3 at 7 [Personal Guarantee Agreement].)  The agreement contains no merger clause or any mention of United Leasing.  (*See id.*)

### e.      Facts Relevant to Defendants' Affirmative Defense and An Alleged Agency Relationship Between Plaintiff and United Leasing

---

[4]Although unstated in the agreement, the total sum of such payments is $451,557.36.

Plaintiff claims that SKMD defaulted on the lease/purchase agreement in the spring of 2006 and that Dr. Katiraie failed to perform SKMD's obligations under the lease as required by the personal guarantee. (*See id.*, SOF ¶¶ 18–22.) While not directly disputing this assertion, Defendants contend that United Leasing tricked SKMD and Dr. Katiraie into entering into the Agreements, and that United Leasing's actions may be imputed to Plaintiff through an agency relationship. (*See* Defs.' Resp. at 13–18.) I first describe the facts relevant to Defendants' affirmative defense, and then discuss the facts relevant to an alleged agency relationship between Plaintiff and United Leasing.

### i. Facts Relevant to Defendants' Affirmative Defense

Defendants contend that United Leasing tricked SKMD and Dr. Katiraie into entering into the Agreements by misrepresenting its true role in these transactions, as well as the actual value of the Equipment and/or the price that SKMD would be required to pay for the Equipment under the lease/purchase agreement. (*See id.*) In support of their arguments, Defendants cite Dr. Katiraie's testimony that United Leasing represented it was financing the lease/purchase of the Equipment *directly*, and that he believed both United Leasing and Plaintiff were owned by United Leasing's president. (*Id.*, SAF ¶ B5; *admitted at* Pl.'s Reply, RSAF ¶ B5.) Defendants also invoke Dr. Katiraie's testimony arguably relating that United Leasing had represented the value and/or price of the Equipment to be $280,000, a figure which appears on the April 4, 2005, "Business

Application" sent from United Leasing to Plaintiff.[5]  (*See* Pl.'s Reply, Ex. 1 at 3 [Katiraie Dep.]; *see also* Defs.' Resp., Ex. C [Business App.].)

### ii.        *Facts Relevant to Alleged Agency Relationship Between Plaintiff and United Leasing*

With respect to an alleged agency relationship between Plaintiff and United Leasing, Plaintiff admits that, before signing the Agreements, Dr. Katiraie had no direct discussions with Plaintiff, and that "[United Leasing] communicated with [Plaintiff] on Dr. Katiraie's behalf." (Defs.' Resp., SAF ¶ B10; *admitted at* Pl.'s Reply, RSAF ¶ B10.)  Moreover, Plaintiff admits that it paid United Leasing $327,500 for the Equipment, but that Dr. Katiraie received no copy of the invoice sent by United Leasing to Plaintiff memorializing this sale.  (*See* Pl.'s Br., SOF ¶ 13; *see also* Defs.' Resp., SAF ¶ B6; *admitted at* Pl.'s Reply, RSAF ¶ B6.)  Dr. Katiraie testified that, upon allegedly learning that United Leasing had itself only paid between $110,00 and $116,000

---

[5]Specifically, Dr. Katiraie — who appears not to speak English perfectly — answered as follows to the following two deposition questions:

> Q:     Is [$280,000] representative of what you were looking for, a CT scanner for approximately $280,000?
> A:     Yeah.  It was an agent of the people who are providing the money, yes.
>            *        *        *
> Q:     My question is, were you looking for a CT scan machine for approximately $280,000?
> A:     At first, when we applied, it could be.

(Pl.'s Reply, Ex. 1 at 3 [Katiraie Dep.].)

for the Equipment, he requested that United Leasing take him off of the lease/purchase agreement, and that United Leasing agreed.[6]  (*See* Defs.' Resp., Ex. B at 16–17 [Katiraie Dep.].)

### f.        Post-Default Negotiations

After Plaintiff notified Dr. Katiraie of his default under the Agreements in 2006, Dr. Katiraie met with Plaintiff and requested that Plaintiff repossess the Equipment.  (*Id.*, SAF ¶ B13; *admitted at* Pl.'s Reply, RSAF ¶ B13.)  Plaintiff declined to do so.  (*Id.*)

## 2.        Procedural History

On October 10, 2006, Plaintiff filed a complaint in this court, alleging breach of the Agreements.  (*See* Case No. 06–cv–02024–EWN–CBS, Compl. [filed Oct. 10, 2006].)  On June 11, 2007, Plaintiff filed a motion for summary judgment, arguing there is no dispute that Defendants breached the Agreements, and that any third-party disputes between Defendants and United Leasing cannot excuse such breach.  (*See* Pl.'s Br.)  On June 21, 2007, Defendants filed a response.  (*See* Defs.' Resp.)  On July 6, 2007, Plaintiff filed a reply.  (*See* Pl.'s Reply.)  This matter is fully briefed and ripe for review.

## ANALYSIS

## 1.        Legal Standard

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, the court may grant summary judgment where "the pleadings, the discovery and disclosure materials on file, and any

---

[6]Such testimony — although possibly inadmissible to prove that United Leasing actually agreed to take him off the lease/purchase agreement — is certainly admissible to demonstrate Dr. Katiraie's state of mind regarding the entity with whom he believed he was contracting.

affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c) (2008); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986); *Concrete Works, Inc. v. City & County of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994). The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works*, 36 F.3d at 1518 (citing *Celotex*, 477 U.S. at 325). The nonmoving party may not rest solely on the allegations in the pleadings, but must instead designate "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324; *see* Fed. R. Civ. P. 56(e)(2) (2008). A fact in dispute is "material" if it might affect the outcome of the suit under the governing law; the dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997) (citing *Anderson*, 477 U.S. at 248). The court may consider only admissible evidence when ruling on a summary judgment motion. *See World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir. 1985). The factual record and reasonable inferences therefrom are viewed in the light most favorable to the party opposing summary judgment. *Byers v. City of Albuquerque*, 150 F.3d 1271, 1274 (10th Cir. 1998) (citing *Concrete Works*, 36 F.3d at 1517).

**2.      *Evaluation of Claims***

The parties do not dispute that Colorado law applies in this diversity action. (*See* Pl.'s Br. at 8; Defs.' Resp. at 13.) Under Colorado law, a party seeking to recover for breach of contract

must prove: (1) the existence of a contract; (2) performance by the plaintiff or some justification for nonperformance; (3) failure to perform the contract by the defendant; and (4) resulting damages to the plaintiff. *W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992). Nonetheless, "[t]he general rule is that a person may be relieved of a contractual obligation if it is shown that he or she was damaged by justifiably relying on a misrepresentation of material fact." *Loden v. Drake*, 881 P.2d 467, 469 (Colo. Ct. App. 1994) (citation omitted).

Plaintiff asserts that there is no dispute that each of the elements of breach of contract is met with respect to both Agreements. (*See* Pl.'s Br. at 8.) Defendants, by contrast, do not directly dispute this assertion, but raise the affirmative defense of fraudulent inducement, and assert that Plaintiff's claimed damages are excessive.[7] (*See* Defs.' Resp. at 13–22.) I first determine what law applies to this dispute, and then assess whether Defendants' proffered evidence of fraudulent inducement is sufficient to demonstrate a genuine issue of material fact sufficient to defeat summary judgment.

---

[7]Defendants claim to be refuting the second element of Plaintiff's breach of contract claims — performance by the plaintiff or some justification for nonperformance — but such a claim is unsupported by logic or law. (*See* Defs.' Resp. at 16.) Indeed, the only authority Defendants cite for their fraudulent inducement argument — the Colorado Civil Jury Instructions — *itself* relates fraudulent inducement to be a species of affirmative defense. *See* CJI–Civ. 4th 30:18 (2007). I accordingly treat Defendants' argument as an affirmative defense.

### a.     Applicable Law

While the issue was not briefed by either party, I find that a determination of which article of the Uniform Commercial Code ("UCC") is applicable to this dispute is essential to deciding Plaintiff's motion on its merits.[8]

Whether a transaction in the form of a lease is actually a true lease or a secured sale masquerading as a lease determines whether Article 2 or 2A of the UCC — pertaining to the sale of goods, and to leases, respectively — controls various aspects of the transaction.[9] *Compare* Colo. Rev. Stat. § 4–2–201 (2007) (defining scope of Article 2 to apply to "transaction in goods"), *with* Colo. Rev. Stat. § 4–2.5–102 (2007) (defining scope of Article 2A to apply to any "transaction . . . that creates a lease").  Whether a purported lease is actually a secured sale, moreover, may be determined from Colorado Revised Statutes section 4–1–203, which provides in relevant part:

> A transaction in the form of a lease creates a security interest if the consideration that the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease and is not subject to termination by the lessee, and . . . [t]he lessee has an option to become the owner of the goods for no additional consideration or for nominal additional consideration upon compliance with the lease agreement.

---

[8]In a single, halfhearted attempt to discuss applicable law, Plaintiff claims in its reply that "if Article 2A applies" then the lease/purchase agreement should be considered a finance lease with various legal conclusions flowing therefrom.  (*See* Pl.'s Reply at 13–15.)  Nonetheless, Plaintiff makes no effort to show whether or not Article 2A applies.

[9]Specifically, it determines whether Article 2's provisions pertaining to the sale of goods apply.  *See* James J. White & Robert S. Summers, UNIFORM COMMERCIAL CODE § 1–1 (5th ed. 2006) (stating that, in most secured transactions relating to goods, Article 2 controls the sales aspects of the transactions).

Colo. Rev. Stat. § 4–1–203(b) (2007).

In the instant case, I find that the lease/purchase agreement between Plaintiff and SKMD was a secured sale masquerading as a lease. First, SKMD was required under the agreement to pay seventy-two monthly payments of $6,271.63 each, and the agreement recites that it cannot be cancelled during the term of the lease. (*See* Pl.'s Br., Ex. 3 at 4 [Lease/Purchase Agreement].) Accordingly, I find SKMD's consideration was "an obligation for the term of the lease and [was] not subject to termination." Colo. Rev. Stat. § 4–1–203(b) (2007). Second, the agreement contains an end-of-term buyout option permitting SKMD to purchase the Equipment for one dollar. (*See* Pl.'s Br., Ex. 3 at 4 [Lease/Purchase Agreement].) Accordingly, I find that SKMD had "an option to become the owner of the [Equipment] for . . . nominal additional consideration." Colo. Rev. Stat. § 4–1–203(b)(4) (2007). As such, I find that the lease/purchase agreement was actually a secured sale masquerading as a lease, and that Article 2 controls the sales aspects of this transaction.

### b.       *Sufficiency of Defendants' Evidence With Respect to Its Affirmative Defense*

Defendants essentially argue that United Leasing — acting under either express or apparent authority from Plaintiff — fraudulently induced SKMD and Dr. Katiraie to enter into the Agreements by misrepresenting its true role with respect to these transactions, as well as the actual value and/or price of the Equipment. (*See* Defs.' Br. at 13–18.) Plaintiff, by contrast, counters that Defendants cannot establish either an agency relationship or fraudulent inducement because Defendants agreed in the lease/purchase agreement that United Leasing was *not* an agent

of Plaintiff and was *not* authorized to speak for Plaintiff, and because this agreement was fully integrated. (*See* Pl.'s Reply at 10–15.)

I first assess whether extrinsic evidence of an agency relationship and fraudulent inducement may be considered in light of the representations in the lease/purchase agreement, and then assess whether Defendant has proffered sufficient evidence to demonstrate a genuine issue of material fact with respect to its affirmative defense.

### i.    Use of Extrinsic Evidence to Demonstrate Fraudulent Inducement

Article 2's codification of the parol evidence rule provides in relevant part that: "[t]erms . . . which are . . . set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein, may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement." Colo. Rev. Stat. § 4–2–202 (2007). Colorado case law interpreting this provision, however, holds that "the parol evidence rule does not preclude admission of parol representations which were inducements for a contemporaneous written contract." *Thrifty Rent-A-Car Sys. of Colo. v. Chuck Ruwart Chevrolet, Inc.*, 500 P.2d 172, 174 (Colo. Ct. App. 1972); *see also Universal Drilling Co. v. Camay Drilling Co.*, 737 F.2d 869, 871 (10th Cir. 1984) (stating that "[a] well recognized exception to the parol evidence rule is when a party to the contract can show fraud in the inducement of the contract").

In the instant case, I find that — even assuming the lease/purchase agreement between Plaintiff and SKMD is fully integrated — the parol evidence rule does not bar Defendants from proffering evidence of United Leasing's alleged misrepresentations relating to its true role in the

-14-

transaction, or the actual value of the Equipment.  I find such evidence — if proven — would constitute "parol representations which were inducements for" the Agreements.  *Thrifty Rent-A-Car Sys. of Colo.*, 500 P.2d at 174.  Specifically, the alleged misrepresentations relating to United Leasing's true role in lease/purchase transaction could have induced Dr. Katiraie to enter into the Agreements with Plaintiff by obfuscating the fact that United Leasing — as the seller of the Equipment to Plaintiff — had an incentive to misrepresent the true value of the Equipment so that SKMD would enter into a more expensive lease/purchase agreement with Plaintiff, thus allowing Plaintiff, in turn, to pay more money to United Leasing for its sale of the Equipment.  Likewise, alleged misrepresentations relating to the actual value and/or price of the Equipment could have induced Dr. Katiraie to enter into the Agreements directly by convincing him that he was getting a good deal and/or that he would be paying less than what the lease/purchase agreement recited was required.  Accordingly, I find that Defendants' proffered evidence — if proven — would constitute "parol representations which were inducements" to the Agreements, and that such evidence is thus not barred by the parol evidence rule.  *See Thrifty Rent-A-Car Sys. of Colo.*, 500 P.2d at 174.

Alternatively, I find that Plaintiff has failed to meet its burden of demonstrating that Defendants' proffered evidence falls within the ambit of the parol evidence rule and should be excluded on that basis.  Indeed, Plaintiff never cites the rule or discusses the fraud exception pertaining thereto, and instead cites this court to platitudinous assertions that courts should

enforce contracts as written, and that parties are bound by all provisions in a contract.[10]  (*See* Pl.'s

Reply at 10–11, 13.)  Because I find Plaintiff's briefing inadequate to prove whether the parol

evidence rule bars United Leasing's proffered evidence of fraudulent inducement, I find that

Plaintiff has failed to carry its burden.  Moreover, I note that, even if the parol evidence rule

applied to bar Defendants' proffered evidence in relation to the lease/purchase agreement, such

evidence could *still* be considered in relation to the personal guarantee as Plaintiff has made no

effort to demonstrate whether *this* agreement: (1) is integrated; (2) contains terms that are

inconsistent with Defendants' proffered evidence; or (3) is controlled by the terms in the

lease/purchase agreement.  (*See* Pl.'s Br.; Pl.'s Reply.)  Accordingly, I find that Defendants'

proffered evidence may be considered, and proceed to analyze Defendants' affirmative defense on

its merits.

### ii.     *Analysis of Defendants' Affirmative Defense on Its Merits*

To analyze the sufficiency of Defendants' affirmative defense, I first assess whether

Defendants have proffered evidence sufficient to suggest that an agency relationship existed

between Plaintiff and United Leasing, and then assess whether they have proffered evidence

sufficient to suggest that United Leasing fraudulently induced them to enter into the Agreements.

A. AGENCY RELATIONSHIP BETWEEN PLAINTIFF AND UNITED LEASING — "An agent can

make his principal responsible for his actions if he is acting pursuant to either actual or apparent

---

[10]One of the unhelpful authorities Plaintiff cites for these platitudinous assertions *itself*
acknowledges that the sanctity of contracts only applies "[w]here a party enters into a contract
absent fraud, duress or incapacity."  *Fox v. I-10, Ltd.*, 957 P.2d 1018, 1022 (Colo. 1998); (*see
also* Pl.'s Reply at 10 n.5 [citing the same].)

authority, regardless of whether the principal has knowledge of the agent's conduct." *Willey v. Mayer*, 876 P.2d 1260, 1264 (Colo. 1994) (citations omitted). "Express authority exists whenever the principal directly states that its agent has the authority to perform a particular act on the principal's behalf." *Id.* (citation omitted). Apparent authority is established "by evidence of written or spoken words or other conduct of the principal which, reasonably interpreted, causes a person to believe that the principal consents to have the act done on his behalf by a person purporting to act for him." *Rush Creek Solutions, Inc. v. Ute Mountain Tribe*, 107 P.3d 402, 407 (Colo. Ct. App. 2004) (citation and internal quotation marks omitted). The existence of an agency relationship is ordinarily a question of fact. *Stortroen v. Beneficial Fin. Co. of Colo.*, 736 P.2d 391, 395 (Colo. 1987).

In the instant case, I find Defendants have proffered evidence sufficient to suggest that United Leasing had express authority to act on behalf of Plaintiff with respect to the transactions at issue. First, Plaintiff itself admits that, before execution of the lease/purchase agreement, Defendants had no direct discussions with Plaintiff, and that "[United Leasing] communicated with [Plaintiff] on Dr. Katiraie's behalf." (Pl.'s Reply, RSAF ¶ B10.) Second, Plaintiff's Senior Account Executive confirmed that, rather than correspond directly with Dr. Katiraie, Plaintiff sent the lease documents directly to United Leasing. (*See* Defs.' Resp., SAF ¶¶ C4, C5; *admitted in relevant part at* Pl.'s Reply, RSAF ¶¶ C4, C5.) Finally, email correspondence between Plaintiff and United Leasing instructs United Leasing to have Dr. Katiraie sign relevant documents and return them to Plaintiff along with Dr. Katiraie's first and last months' rent checks. (*Id.*, Ex. H at 2 [4/22/05 Email].) Accordingly, I find Defendants have proffered evidence more than sufficient

to suggest that United Leasing had express authority to act on behalf of Plaintiff with respect to the relevant transactions. *See Willey*, 876 P.2d at 1264.

Plaintiff nonetheless argues against the above conclusion by claiming that the clause in the lease/purchase agreement reciting that "[SKMD] AGREE[S] THAT NEITHER SUPPLIER NOR ANY SALESPERSON, EMPLOYEE OR AGENT OF SUPPLIER IS OUR AGENT OR HAS ANY AUTHORITY TO SPEAK FOR US OR TO BIND US IN ANY WAY" makes "patently unreasonable any claim that [United Leasing] . . . [was] Plaintiff's agent." (Pl.'s Reply at 11–12.) I disagree. The test for whether express authority exists contains no requirement of specific assent or scienter on behalf of *third parties*, and merely requires that "[a] principal directly state[] that its agent has the authority to perform a particular act on the principal's behalf." *Willey*, 876 P.2d at 1264. As such, I find SKMD's disclaimer of an agency relationship between Plaintiff and United Leasing simply irrelevant to the question of whether such a relationship in fact existed between these parties. Moreover, I note that, even in cases in which the alleged principals and agents *themselves* disclaim the existence of an agency relationship, courts routinely find such disclaimers only weakly probative of whether such relationships in fact exist. *See, e.g.*, *Am. Home Mortgage Corp. v. First Am. Title*, No. 07-01257 (JLL), 2007 WL 3349430, at *5 (D.N.J. Nov. 9, 2007) (collecting cases discussing effect of express disclaimers of agency relationship between purported principals and agents). As has been explained, "[i]f courts routinely recognized disclaimers of agency, parties could conduct themselves as principal and agent without legal ramifications that accompany that special relationship." *Id.* (citation omitted). As such, I find that — even assuming that SMKD's disclaimer of an agency relationship between Plaintiff and

United Leasing is relevant — this disclaimer provides only weak evidence as to the true nature of this relationship, and is insufficient to demonstrate that such a relationship did *not* exist as a matter of law.[11] Accordingly, I find Plaintiff's reliance on SKMD's apparent disclaimer of an agency relationship between Plaintiff and United Leasing insufficient to prove the non-existence of such a relationship as a matter of law.

B. DEFENDANTS' PROFFERED EVIDENCE OF FRAUDULENT INDUCEMENT — To establish fraudulent inducement on behalf of United Leasing, Defendants must prove: (1) a misrepresentation of a material fact by United Leasing; (2) Defendants' reliance on this misrepresentation; (3) that such reliance was reasonable; and (4) that such reliance caused Defendants' damages. *See M.D.C./Wood, Inc. v. Mortimer*, 866 P.2d 1380, 1382 (Colo.1994). While Plaintiff does not dispute that Defendants may establish these elements, it makes five scattershot arguments which purport to show that Defendants nonetheless cannot establish their affirmative defense as a matter of law. (*See* Pl.'s Reply at 12–18.) I assess each of these arguments in turn.

First, Plaintiff makes the frivolous argument that Dr. Katiraie's deposition statement that he believed the president of United Leasing was "an honest man and that he will not [sic] defraud

---

[11] At best, Plaintiff's argument might be interpreted as an appeal to equitably estop Defendants from claiming the existence of an agency relationship given SKMD's representation in the lease/purchase agreement that no such relationship existed. Nonetheless, I find that equity offers no refuge for Plaintiff on the facts of this case because equitable estoppel requires, *inter alia*, that the party to be estopped have known the true facts behind his earlier representation, and that the party to benefit from estoppel have been ignorant of these facts. *See Calhan Chamber of Commerce v. Town of Calhan*, 166 P.3d 200, 204 (Colo. Ct. App. 2007).

a doctor who does not know much about business" somehow proves that "no false statement of material fact with intent to defraud" was made by United Leasing. (*See* Pl.'s Reply at 12.) This argument is preposterous. First, the *context* of Dr. Katiraie's statement clearly demonstrates that he was trying to explain why he did not read the lease/purchase agreement more carefully, and his erstwhile perception of the forthrightness of United Leasing's president is in any event irrelevant to whether United Leasing fraudulently induced Dr. Katiraie to enter into the Agreements. (*See* Defs.' Resp., Ex. B. at 5 [Katiraie Dep.].) Second, Plaintiff fails to cite any law suggesting that material misrepresentations need be made intentionally, or that a defrauded party's *perception* of the alleged fraudster's forthrightness provides competent evidence — circumstantial or otherwise — of the alleged fraudster's actual mental state. (*See* Pl.'s Reply at 12.) If anything, I find that Dr. Katiraie's statement might actually *help* Defendants by suggesting that Dr. Katiraie's reliance on any alleged misrepresentations was *reasonable*, and therefore accord this frivolous argument no further attention.

Second, Plaintiff rehashes its unpersuasive agency argument, that because United Leasing was not Plaintiff's agent, any alleged fraudulent inducement on behalf of United Leasing cannot be imputed to Plaintiff. (*Id*. at 12.) Because I have already found that sufficient evidence of express authority exists to demonstrate a genuine issue of material fact as to an agency relationship between Plaintiff and Untied Leasing, this argument fails.

Third, Plaintiff similarly rehashes its argument that, because the lease/purchase agreement is fully integrated, any allegedly fraudulent misrepresentations by United Leasing are subsumed within other representations of the agreement. (*See id*. at 13.) This argument fails because the

only purportedly inconsistent representation Plaintiff cites in the lease/purchase agreement is an "AS IS" clause, and this clause bears no discernable relation to United Leasing's alleged misrepresentations regarding its true role in the lease/purchase transaction, or the actual value of the Equipment.[12] (*See id.*)

Fourth, Plaintiff spills three pages of ink discussing inapposite case law and inapplicable statutory provisions relating to finance leases under Article 2A, without ever pausing to consider whether Article 2A *even applies* to the underlying lease/purchase transaction. (*See id.* at 13–15.) Because I have found that it does not, I give this argument no further attention.

Finally, Plaintiff claims that by accepting and retaining the medical equipment and making payments, Defendants' obligations under this agreement became "irrevocable" under Article 2A and Colorado common law. (*See id.* at 15–17.) Because this argument suffers from different flaws relating to both Article 2A and Colorado common law, I discuss it in two separate parts as follows:

I. ARTICLE 2A — First, Plaintiff cites inapplicable Article 2A law for a bevy of propositions, amongst them that the lease/purchase agreement was not subject to cancellation, termination, or modification; that Defendants did not properly "reject" the Equipment because their initial protests regarding United Leasing's alleged misrepresentations were directed at United Leasing, not Plaintiff; and that Defendants cannot now "revoke" the lease/purchase agreement because such revocation would be untimely. (*Id.* at 15–16.) Despite the obvious problem that

---

[12]Specifically, this clause relates: "We are leasing the Equipment to you 'AS-IS.'" (*See* Pl.'s Br., Ex. 3 at 3 [Lease/Purchase Agreement].)

Article 2A law has no applicability to the instant transaction, these arguments suffer from the more fundamental flaw; namely, that none of this law — or even its statutory analogues in Article 2 — has any apparent bearing upon the *affirmative defense* of fraudulent inducement.

Put simply, Defendants do not seek to cancel the Agreements, reject the Equipment, or revoke their acceptance of this Equipment; instead, they claim the Agreements are *unenforceable* because they were fraudulently induced through misrepresentations. Unless displaced by specific provisions, the UCC leaves common law of fraudulent inducement undisturbed, so whatever *additional* actions Defendants might have taken under the Code are irrelevant to the validity of their affirmative defense. *See* Colo. Rev. Stat. § 4–1–103(b) (2007) (stating that, unless displaced by specific Code provisions, the common law of fraud and misrepresentation supplements the provisions of the UCC). At a minimum, I find Plaintiff has failed to cite any relevant Code provision from Article 2 that might support its argument, or prove that such a provision purportedly displaces the common law affirmative defense of fraudulent inducement.    II. COLORADO COMMON LAW — Second, Plaintiff cites Colorado common law for the proposition that "[i]f one elects to affirm [an] agreement, after full knowledge of the truth respecting the false and fraudulent representations, and thereafter continues to carry it out and receive its benefits, he may not thereafter maintain an action in damages for deceit." (Pl.'s Reply at 18 [quoting *Bennet v. Coors Brewing Co.*, 189 F.3d 1221, 1233 (10th Cir. 1999)].) Plaintiff argues that, because Defendants retained the Equipment after discovering United Leasing's alleged misrepresentations, made payments under the agreement, and negotiated for forbearance with Plaintiff, such actions

constitute "ratification of any alleged fraud" as a matter of law. (Pl.'s Reply at 17–18.) For the reasons set forth below, I find this argument is both disingenuous and unavailing.

First, Plaintiff fails to cite *any* law describing what constitutes "affirmation" of a contract as a matter of law. (*See id.*) Instead, all three cases upon which Plaintiff purports to rely simply stand for the common-sense proposition that a defrauded party may not *both* seek rescission of a contract *and* sue under that contract for damages reflecting the benefit of the bargain the defrauded party would have received had the true facts tracked the defrauding party's misrepresentations. *See Bennet*, 189 F.3d at 1233; *Tomkins v. Tomkins*, 243 P. 632, 635 (Colo. 1926); *Laramie Poudre Irrig. Co. v. Redfeather Lake Resort, Inc.*, 31 P.2d 917, 918 (Colo. 1934). *None* of these cases discusses what constitutes affirmation of a contract as a matter of law. *See id.*

Second, even assuming that these cases stated that continued payments and retention of the Equipment might constitute affirmation of the lease/purchase agreement as a matter of law, Plaintiff's argument would *still* fail because Plaintiff *itself* claims that Dr. Katiraie stopped making payments on the medical equipment in 2006, and because it is undisputed that Dr. Katiraie requested that Plaintiff repossess the Equipment upon being informed of his alleged default. (*See* Pl.'s Br., SOF ¶¶ 18–22; *see also* Defs.' Resp., SAF ¶ B13; *admitted at* Pl.'s Reply, RSAF ¶ B13); *see also Martinez v. Affordable Housing Network, Inc.*, 109 P.3d 983, 987 (Colo. Ct. App. 2004) (stating that a defrauded party may manifest an election to rescind a contract by "tender[ing] back, *or offer[ing] to tender back*, to the other party any benefit received pursuant to

the agreement" [emphasis added]), *rev'd in part on other grounds by* 123 P.3d 1201 (Colo. 2005).

Finally, Plaintiff has failed to discuss — let alone prove — whether an action for damages in deceit is conceptually or legally analogous to the affirmative defense of fraudulent inducement, and thus whether Defendants must even *choose* between affirmation of the lease/purchase agreement and maintenance of their affirmative defense. (*See* Pl.'s Reply.) Accordingly, I find that Plaintiff has failed to prove that Defendants' actions constitute affirmation of the lease/purchase agreement as a matter of law, or even whether such affirmation would preclude Defendants from asserting their affirmative defense.

### 3.   Conclusion

Based on the foregoing it is therefore ORDERED that:

1.     PLAINTIFF's motion (#88) is DENIED.

The court will hold a Final Pretrial Conference commencing at 3:30 o'clock p.m. on March 6, 2008, in Courtroom A201 of the Alfred A. Arraj United States Courthouse, 901 19th Street, Denver, Colorado. In preparing for and participating in the conference, the parties and counsel will (1) follow the Instructions for Preparation and Submission of Final Pretrial Order, a copy of which can be downloaded from the court's web site, specifically

http://www.cod.uscourts.gov/Documents/Judges/EWN/ewn_fin_pre_ord_ins.pdf and (2) utilize the specific template located at

http://www.cod.uscourts.gov/Documents/Judges/EWN/ewn_fin_pre_ord.wpd These specific web addresses should be used to insure that the proper format is observed.

Dated this 20th day of February 2008.

BY THE COURT:

s/ Edward W. Nottingham
EDWARD W. NOTTINGHAM
Chief United States District Judge